UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

KATHY CRANFORD, an individual; and as the mother and guardian for NICHOLAS CRANFORD, a minor, and EDWARD CRANFORD, a minor,

   Plaintiffs,

v.

GARY UNDERHILL in his official capacity; MIKE MIERAS in his official and individual capacity; the WASHOE COUNTY SCHOOL DISTRICT and DOES 1 through 10,

   Defendants.

03:06-CV-00111-LRH-GWF

ORDER

  Before the court is Defendants Gary Underhill ("Underhill"), Mike Mieras ("Mieras""), and Washoe County School District's ("WCSD") motion for summary judgment (#44[1]). Plaintiffs Kathy, Nicholas, and Edward Crawford ("the Cranfords") have responded (#45), and the defendants have replied (#46).

**I. Factual and Procedural History**

  Nicholas and Edward Cranford, brothers, are black Hug High School ("HHS") students. (Defs.' Mot. for Summ. J. (#44), WCSD transcripts, Ex. 2 at 070, 071, 002-004.) On Monday, March 7, 2005, Nicholas Cranford ("Nicholas") got into a "play-fight" with another student on

---

[1] Refers to court's docket number

1  HHS grounds as school let out for the day. (Defs.' Mot. for Summ. J. (#44), Nicholas Dep., Ex. 3
2  at 48:19-20.) The other student first swung at Nicholas and after a brief scuffle they fell to the
3  ground, where they continued to wrestle, *id*. at 48-50, as a crowd developed, (Defs.' Mot. for
4  Summ. J. (#44), Kallay Decl., Ex. 10 ¶ 4). Underhill, a one-year employee with the Washoe
5  County School District Police Department ("WCSDPD"), Tom Kallay, Hug's principal, and James
6  Ballard, a Hug teacher, witnessed the initial blows. (Defs.' Mot. for Summ. J. (#44), Underhill
7  Decl., Ex. 7 ¶ 3; Defs.' Mot. for Summ. J. (#44), Kallay Decl., Ex. 10 ¶ 3; Defs.' Mot. for Summ. J.
8  (#44), Ballard Voluntary Statement, Ex. 13.)

9  Kallay, unaware of Underhill's proximity, radioed for school police assistance. (Defs.'
10 Mot. for Summ. J. (#44), Kallay Decl., Ex. 10 ¶ 3.) Meanwhile, Underhill intervened in the fight.
11 (Defs.' Mot. for Summ. J. (#44), Underhill Dep., Ex. 6 at 210:5-13.) Underhill "proned out"
12 Nicholas by placing Nicholas on the ground on his stomach and pressing his knee between
13 Nicholas's shoulder blades. (Defs.' Mot. for Summ. J. (#44), Underhill Decl., Ex. 7 ¶ 4.) It is
14 unclear whether Nicholas was on the floor, (Defs.' Mot. for Summ. J. (#44), Nicholas Dep., Ex. 3
15 at 50:19-21), or standing, *id*. at 51:6, when Underhill placed Nicholas on the ground. The
16 "proning" lasted for less than a minute, (Defs.' Mot. for Summ. J. (#44), Rafaqat Decl. & Report,
17 Ex. 14 at 4), and caused Nicholas temporary pain that dissipated within a few hours, (Defs.' Mot.
18 for Summ. J. (#44), Nicholas Dep., Ex. 3 at 66-67).

19 After Underhill had Nicholas on the ground, Underhill handcuffed Nicholas and began to
20 walk Nicholas and the other student toward a police cruiser for transport to a juvenile detention
21 facility. *Id*. at 60:19. Two other WCSDPD officers accompanied Underhill. (Defs.' Mot. for
22 Summ. J. (#44), Edward Dep., Ex. 4 at 30:9-18.) During the walk, Edward Cranford ("Edward"),
23 Nicholas's younger brother, approached Nicholas and Underhill and asked Nicholas for their
24 mother Kathy Cranford's ("Kathy") cell phone number. (Defs.' Mot. for Summ. J. (#44), Nicholas
25 Dep., Ex. 3 at 60:22-23.) Edward asked for the number twice, and the second request brought

26

1  Edward close enough that Underhill loudly said "get back" and pushed Edward away with his hand.
2  *Id*. at 61:21-23; (Defs.' Mot. for Summ. J. (#44), Underhill Decl., Ex. 7 ¶ 6.)  Edward sustained no
3  injuries from the contact.  (Defs.' Mot. for Summ. J. (#44), Edward Dep., Ex. 4 at 36:2-3.)

4  The following day, Underhill issued Edward a citation for obstruction of justice.  *Id*. at 41-
5  42.  In addition, Nicholas was charged with misdemeanor affray,[2] but the charges were later
6  dropped.  (Defs.' Mot. for Summ. J. (#44), Nicholas Dep., Ex. 3 at 65-66.)

7  As a result of the foregoing, the Cranfords filed this action alleging a violation of the Fourth
8  Amendment, a violation of Title VI, and a state law claim for negligent supervision and training.

9  **II.    Legal Standard**

10  Summary judgment is appropriate only when "the pleadings, the discovery and disclosure
11  materials on file, and any affidavits show that there is no genuine issue as to any material fact and
12  that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In assessing a
13  motion for summary judgment, the evidence, together with all inferences that can reasonably be
14  drawn therefrom, must be read in the light most favorable to the party opposing the motion.
15  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne*
16  *v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

17  The moving party bears the burden of informing the court of the basis for its motion, along
18  with evidence showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*,
19  477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the moving party
20  must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could
21  find other than for the moving party."  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir.
22  1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).  For
23  those issues where the moving party will not have the burden of proof at trial, the movant must

---

[2] The crime of affray is defined as follows: "If two or more persons shall, by agreement, fight in a public place, to the terror of the citizens of this state, the persons so offending commit an affray and are guilty of a misdemeanor."  Nev. Rev. Stat. § 203.050.

3

1  point out to the court "that there is an absence of evidence to support the nonmoving party's case."
2  *Celotex Corp.,* 477 U.S. at 325.

3  In order to successfully rebut a motion for summary judgment, the non-moving party must
4  point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v.*
5  *Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might
6  affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
7  242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary
8  judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute
9  regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could
10 return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of a
11 scintilla of evidence in support of the plaintiff's position will be insufficient to establish a genuine
12 dispute; there must be evidence on which the jury could reasonably find for the plaintiff. *See id.* at
13 252.

14 **III.  Discussion**

15     **A. Underhill's Bankruptcy**

16 As a threshold matter, the defendants argue the court should dismiss them all because
17 Underhill has filed for bankruptcy. *In re Underhill*, #BK-N-06-50609-GWZ. The bankruptcy
18 filing generates an automatic stay of litigation against Underhill, 11 U.S.C. § 362(a)(1), and the
19 Cranfords filed the present action subsequent to Underhill's bankruptcy petition. Therefore, the
20 defendants argue, the court should dismiss all defendants because the present action was void *ab*
21 *initio*.

22 Under 11 U.S.C. § 362(a)(1), a bankruptcy petition operates as a stay applicable to a judicial
23 proceeding against the debtor. A proceeding in violation of the stay is void *ab initio*. *See Parker v.*
24 *Bain*, 68 F.3d 1131, 1138 (9th Cir. 1995). However, all proceedings in a single case are not
25 lumped together for purposes of automatic stay analysis. *See, e.g.*, *Maritime Elec. Co., Inc. v.*

26

4

1  *United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir. 1991).

2  Here, Underhill filed for personal bankruptcy on August 26, 2006. *In re Underhill*, #BK-N-
3  06-50609-GWZ. The Cranfords filed their complaint on September 26, 2006. However, since the
4  Cranfords' claims against Underhill in his official capacity are, in essence, claims against Washoe
5  County, *see Hafer v. Melo*, 502 U.S. 21, 25 (1991), Underhill's personal bankruptcy filings do not
6  stay the proceedings against him in his official capacity, *see Maritime Elec Co.*, 959 F.2d at 1204.
7  While the stay does apply to judicial proceedings against Underhill in his individual capacity, the
8  parties have stipulated that Underhill is not a defendant in this action in his individual capacity.
9  (Dec. 17, 2007, Order (#43).) Therefore, the automatic stay does not require the court to dismiss all
10 defendants.

11 Finally, the defendants contend that the Cranfords' failure to respond to this argument
12 warrants its admission pursuant to Local Rule 7-2(d).[3] Since the argument amounts to showing that
13 claims against a defendant not a party to this suit are void, its admission does not affect this case in
14 any way.

15 **B.  42 U.S.C. § 1983 Fourth Amendment Violation**

16 Nicholas and Edward allege that their detentions and arrests violate the Fourth
17 Amendment's prohibition on unreasonable searches and seizures. In particular, Nicholas and
18 Edward allege that Underhill lacked probable cause to detain and arrest them and that Underhill
19 used excessive force in detaining and arresting them.

20 The evidence presented in this case demonstrates Underhill is the officer that arrested
21 Nicholas and pushed and cited Edward. Thus, Underhill, in his individual capacity, is the
22 defendant who would be liable for the alleged Fourth Amendment violations. Subsequent to the
23 filing of the present motion, the parties have stipulated (#43) to the dismissal of Underhill in his

---

25 [3]LR 7-2(d) provides in relevant part, "The failure of an opposing party to file points and authorities in
response to any motion shall constitute a consent to the granting of the motion."

26

1  individual capacity while keeping Underhill as a defendant in his official capacity.  In light of this
2  stipulation, Nicholas and Edward's Fourth Amendment claim is no longer viable.  *See Hafer*, 502
3  U.S. at 25 (distinguishing personal capacity and official capacity actions).

4  However, to the extent the actions of Underhill were based on an official custom or policy,
5  a cause of action may still exist.  An official-capacity suit represents another way of pleading an
6  action against the entity of which the officer is an agent.  *Id*.  "Because the real party in interest in
7  an official-capacity suit is the governmental entity and not the named official, 'the entity's policy or
8  custom must have played a part in the violation of federal law.'" *Id*. (quoting *Kentucky v. Graham*,
9  473 U.S. 159, 166 (1985)).  Whether or not a custom or policy exists is addressed below.

10  **C.  Custom or Policy**

11  The Cranfords argue Underhill acted pursuant to direction from Mieras, the Chief of School
12  Police, in discriminating against black students by treating them more harshly.  A local government
13  may be sued under § 1983 when an injury is inflicted as a result of the "execution of a
14  government's policy or custom, whether made by its lawmakers or by those whose edicts or acts
15  may fairly be said to represent official policy. . . ."  *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 694
16  (1978).  Similarly, "[a] supervisor may be held liable under § 1983 if he or she was personally
17  involved in the constitutional deprivation or a sufficient causal connection exists between the
18  supervisor's unlawful conduct and the constitutional violation." *Jackson v. City of Bremerton*, 268
19  F.3d 646, 653 (9th Cir. 2001) (citations omitted).  No liability exists under § 1983 where no injury
20  or constitutional violation occurred.  *Id.*

21  The Cranfords base their custom or policy argument on Underhill's statement that he was
22  told, and agreed, that the school police had to regain control of the school.  (Pls.' Opp'n to Defs.'
23  Mot. for Summ. J. (#45), Underhill Dep., Ex. 3 at 75-76.)  The court finds this statement
24  insufficient as evidence of a custom or policy.  The fact Underhill was told that school police had to
25  regain control of the school does not suggest that control would be regained at the expense of
26

6

1  constitutional rights.  To put this statement in context, Underhill indicated the school had problems
2  in terms of drugs, gang activity, fights and that it was not a positive learning environment.  *Id*. at
3  79:1-23.  Thus, Underhill took the personal view that he would enforce the rules strictly and make
4  arrests rather than citations.  *Id*. at 76:8-13.  In short, nothing in Underhill's deposition testimony
5  indicates a custom or policy of making unlawful arrests or using excessive force.
6        The Cranfords next cite to the deposition testimony of Debra Feemster ("Feemster"),
7  Diversity Coordinator, as evidence of a custom or policy.  Feemster indicated she had seen certain
8  individuals treat students of color unfairly.  (Pls.' Opp'n to Defs.' Mot. for Summ. J. (#45),
9  Feemster Dep., Ex. 6 at 51-52.)  However, Feemster further stated, "It could be [due] to lack of
10 education.  I don't think people do things deliberately, I would hope not."  *Id*. at 51:21-23.
11       The fact Feemster may have witnessed discriminatory treatment does not suggest the
12 existence of an official custom or policy.  Feemster has not identified any individuals who
13 discriminated against students of color nor has she testified as to any policy that allowed for such
14 discriminatory treatment.  As such, this testimony is not evidence of an official policy or custom.
15       The Cranfords next request the court to take judicial notice of previous actions before the
16 court involving allegations Underhill illegally arrested other African-American students.  The
17 Cranfords' request for judicial notice will be denied on the basis of relevance.  The fact the
18 Cranfords' counsel has filed similar actions against Underhill containing allegations of unlawful
19 arrests does not indicate WCSD has an official policy or custom regarding such a practice.  This is
20 especially true in light of WCSD's vindication on all similar policy or custom claims in each of
21 these suits.  Case Nos. ## 3:05-CV-00175-LRH-RJJ; 3:05-CV-00176-LRH-RJJ; 3:05-CV-00178-
22 LRH-RJJ; 3:05-CV-00179-LRH-RJJ.  There is no evidence Underhill was responsible for creating
23 the official policy or custom of WCSD.  Furthermore, there is no evidence indicating Underhill
24 treated black students and non-black students differently.
25       Finally, the Cranfords argue the superintendent was aware of the problems at HHS but took
26

1  no action. The Cranfords have presented evidence indicating Paul Dugan ("Dugan") was familiar
2  with several complaints against Underhill. (Pls.' Opp'n to Defs.' Mot. for Summ. J. (#45), Dugan
3  Dep., Ex. 7 at 80.) However, the evidence further shows Dugan had discussions with personnel
4  concerning these complaints. *Id*. at 78:8-10. Thus, there is no evidence Dugan failed to take action
5  or that any unlawful custom or policy existed at HHS.
6  In short, the defendants met their initial burden of showing the Cranfords have no evidence
7  of a custom or policy. The Cranfords failed to rebut this showing as they have presented no
8  evidence of such a custom or policy. Thus, summary judgment will be granted.

**D. Title VI**

10  The Cranfords' second cause of action alleges a violation of Title VI of the Civil Rights Act
11  of 1964, 42 U.S.C. § 2000d. Title VI provides, "[n]o person in the United States shall, on the
12  ground of race, color, or national origin, be excluded from participation in, be denied the benefits
13  of, or be subjected to discrimination under any program or activity receiving Federal financial
14  assistance." 42 U.S.C. § 2000d. This provision creates a private right of action for both injunctive
15  relief and damages. *Alexander v. Sandoval*, 532 U.S. 275, 279 (2001). To state a claim for
16  damages under Title VI, a plaintiff must allege that (1) the entity involved is engaging in racial
17  discrimination, and (2) the entity involved is receiving federal financial assistance. *Fobbs v. Holy*
18  *Cross Heath Sys. Corp.*, 29 F.3d 1439, 1447 (9th Cir. 1994), *overruled on other grounds by*
19  *Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131 (9th Cir. 2001). Discrimination must
20  be intentional in order to be actionable under Title VI. *Sandoval*, 532 U.S. at 280. In addition, a
21  plaintiff must prove that he is an intended beneficiary of the federally-funded program at issue. *The*
22  *Epileptic Found. v. City and County of Maui*, 300 F.Supp.2d 1003, 1011 (D. Haw. 2004) (citing
23  *Wrenn v. Kansas*, 561 F.Supp. 1216, 1212 (D. Kan. 1983)).
24  Looking at the evidence in the light most favorable to the Cranfords, the court finds no
25  evidence of intentional discrimination. To establish discriminatory intent, the Cranfords first argue

8

seventy-five percent of the student body at HHS consists of minorities. Although the Cranfords are correct HHS is largely composed of minority students, (Pls.' Opp'n to Defs.' Mot. for Summ. J. (#45), Dugan Dep., Ex. 3 at 80:9-15), such statistics do not suggest intentional discrimination.

Similarly, as discussed above, Underhill's statement regarding the school police regaining control of the school, (Pls.' Opp'n to Defs.' Mot. for Summ. J. (#45), Underhill Dep., Ex. 3 at 75-76), does not show intentional discrimination. Nothing in Underhill's statement indicates school police were treating students differently on account of their race. Rather, Underhill's statement was a response to problems that were occurring at Hug High School.

The Cranfords also argue several instances of discrimination occurred and were sanctioned by the administration in the 2003-2004 school year. Patrick McGuire ("McGuire"), a teacher, testified a vice-principal by the name of Redmond singled out Hispanic and African-American students for suspensions. (Pls.' Opp'n to Defs.' Mot. for Summ. J. (#45), McGuire Dep., Ex. 8 at 14-15, 21-22.) This testimony fails to create a genuine issue of material fact. McGuire's testimony does not identify any individual other than Redmond that discriminated against minority students. Furthermore, there is no evidence concerning whether Redmond is still employed at Hug High School. Finally, there is no evidence that Redmond was involved with any decision regarding the plaintiffs in this case.

The Cranfords next rely on the testimony of Feemster. As previously discussed, Feemster indicated she had seen certain individuals treat students of color unfairly. (Pls.' Opp'n to Defs.' Mot. for Summ. J. (#45), Feemster Dep., Ex. 6 at 51-52.) This testimony fails to establish a genuine issue of material fact because Feemster explicitly opined the discrimination was not deliberate. *Id*. at 51:21-23.

The Cranfords also rely on the double-hearsay statement of Feemster who was told by a teacher's aide that a teacher allegedly said, "they need to get rid of all black kids." *Id*. at 57:12-16. This double-hearsay statement is inadmissible and cannot be considered in a motion for summary

judgment. *See* Fed. R. Evid. 801, 802; *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (2002) ("A trial court can only consider admissible evidence in ruling on a motion for summary judgment.") Even if this statement were admissible, it fails to show the actions taken against Nicholas and Edward were intentionally discriminatory. There is no indication the teacher who allegedly made the statement at issue played any role in the events of this case.

Finally, the Cranfords argue WCSD had a dropout prevention policy that was not applied to black students. The Cranfords have provided evidence indicating "graduation specialists" contact students that have failed one or more classes and have had one or more absences. (Pls.' Opp'n to Defs.' Mot. for Summ. J. (#45), Beye Dep., Ex. 10 at 21:13-25.) Furthermore, there is evidence indicating neither Nicholas nor Edward were contacted by a graduation specialist. (Pls.' Opp'n to Defs.' Mot. for Summ. J. (#45), Kathy Aff., Ex. 19 ¶ 3.)

Once again, the court finds this evidence insufficient to suggest intentional discrimination. The fact neither Nicholas nor Edward were contacted by a graduation specialist is not, by itself, evidence of discrimination. The Cranfords have provided no evidence as to whether other, non-black, students were contacted by the graduation specialist. It is certainly possible the graduation specialist failed to contact students of all races. Without evidence indicating black students were denied contact with the graduation specialist while other non-black students had such contact, the court cannot say that the failure to contact Nicholas or Edward is evidence of intentional discrimination.

Thus, the court finds the defendants met their initial burden of demonstrating no evidence supports the Cranfords' Title VI claim. The Cranfords failed to rebut the motion by setting forth evidence that demonstrates a genuine issue of material fact. As such, summary judgment will be granted on the Cranfords' cause of action pursuant to Title VI.

**E.  Negligent Supervision and Training**

The Cranfords' third claim for relief states a claim for negligent supervision and training.

"'The tort of negligent hiring imposes a general duty on the employer to conduct a reasonable background check on a potential employee to ensure that the employee is fit for the position.'" *Hall v. SSF, Inc.*, 930 P.2d 94, 98 (Nev. 1996) (quoting *Burnett v. C.B.A. Sec. Serv.*, 820 P.2d 750, 752 (Nev. 1991)). "An employer breaches this duty when it hires an employee even though the employer knew, or should have known, of that employee's dangerous propensities." *Id*. (citing *Kelley v. Baker Protective Services, Inc.*, 401 S.E.2d 585, 586 (Ga. 1991)). Employers also have a duty to use reasonable care in training, supervision, and retention of his or her employees to make sure that employees are fit for their positions. *Id*. (citing 27 Am. Jur. 2d *Employment Relationship* §§ 475-76 (1996)).

As evidence of negligent hiring, the Cranfords first rely on the deposition of Underhill. During his deposition, Underhill indicated he had previously applied to the Sparks Police Department. (Pls.' Opp'n to Defs.' Mot. for Sum. J. (#45), Underhill Dep., Ex. 3 at 18:11-12.) Underhill was told he was not hired because he did not pass his "department psych." *Id*. at 19:3-5. However, Underhill later found out he did pass and was not hired due to a personal conflict. *Id*. at 19:6-10.

As an initial matter, the Cranfords have provided no evidence Underhill actually failed any psychological exam. Underhill's own testimony indicates Underhill believes he passed the exam. Nevertheless, even if Underhill failed the exam, there is no evidence that the failing of the exam is in any way related to the allegations of unlawful arrest and excessive force in this case. In order for an employer to be liable for negligent hiring, there must be evidence that the employer's negligence caused the alleged injury. *See Hall*, 930 P.2d at 98; *Rockwell v. Sun Harbor Budget Suites*, 925 P.2d 1175, 1226-27 (Nev. 1996). Here, there is no evidence indicating what the psychological exam tests are for or why Underhill allegedly failed the exam. More importantly, the Cranfords have presented no evidence Underhill was involved with unlawful arrests or excessive force prior to being hired by WCSD. Finally, the Cranfords have presented no evidence WCSD failed to

11

1 conduct a reasonable background check.

2 The Cranfords next rely on the deposition of Mike Mieras ("Mieras") to argue there was no training budget for the 2004-2005 school year. Although there was no money specifically designated for training, Mieras explicitly stated that money from the general fund is used to send some officers to training. (Pls.' Opp'n to Defs.' Mot. for Summ. J. (#45), Mieras Dep., Ex. 18 at 18:20-25.)

The Cranfords next allege that Underhill was negligent in complying with Mieras's negligent order to "take back control of the school." (Pls.' Opp'n to Defs.' Mot. for Summ. J. (#45), at 20:23-24.) To the extent that complying with such an order may be considered "training" or "supervision," the Cranfords have provided no support–other than conclusory allegations–for the contention that Mieras's order was negligently issued. As discussed above, there is no evidence that Mieras's order targeted specific racial groups. Indeed, what evidence there is suggests that the order reasonably responded to unruly conditions at HHS. *See* (Defs.' Rep. to Pls.' Opp'n to Defs.' Mot. for Summ. J. (#46), Underhill Dep., Ex. 1 at 79:8-20.)

The Cranfords next rely on a May 12, 2005, evaluation of Underhill. The evaluation indicates Underhill "needs to transition from a traditional law enforcement agency to a specialized (school district police) agency." (Pls.' Opp'n to Defs.' Mot. for Summ. J. (#45), May 12, 2005, Employee Performance Evaluation Report, Ex. 20.) Although this unauthenticated document indicates Underhill needed to make a "transition," it does not demonstrate WCSD was negligent in failing to train Underhill. If anything, the evaluation demonstrates WCSD was working with Underhill to improve his job performance.

The Cranfords argue superintendent Dugan and Mieras were aware of numerous complaints against Underhill and failed to act until the end of the school year. The Cranfords have presented evidence Dugan was familiar with several complaints against Underhill during the 2004-2005 school year. (Pls.' Opp'n to Defs.' Mot. for Summ. J (#45), Dugan Dep., Ex. 16 at 78:4-7.) Dugan

testified he had discussions with Mieras and Grein in response to this knowledge. *Id*. at 78:8-10.

Finally, the Cranfords suggest that an Internal Affairs investigation found that Underhill did not follow police procedure and would exacerbate situations. The document the Cranfords cite in support of this contention contains nothing that indicates Underhill either strayed from police procedure or exacerbated situations. On the contrary, the investigation conludes,

> There is no evidence to suggest that Officer Underhill exceeded his authority and used unreasonable force against Nicholas. It appears Officer Underhill acted properly by addressing the fight. [H]is use of force against Nicholas appears to be within the Department's policy, training, and guidelines.

(Pls.' Opp'n to Defs.' Mot. for Summ. J (#45), Internal Affairs Inv., Ex. 20 at 9.)

In short, the Cranfords have provided no evidence indicating WCSD failed to investigate the complaints or provide training and supervision to Underhill. Thus, the Cranfords have failed to rebut the defendants' properly-supported motion and summary judgment will be granted

IT IS THEREFORE ORDERED that the defendants' Motion for Summary Judgment (#44) is hereby GRANTED.

The Clerk of the court shall enter judgment accordingly.

IT IS SO ORDERED.

DATED this 26th day of July 2008.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE